Billy T. **ADAMS** and **Herman Adams,**
Plaintiffs,

v.

**BANK OF HYDRO,** Defendant.

**Civ. No. 63–245.**

United States District Court
W. D. Oklahoma.

April 1, 1965.

Charles F. Koehne, Jr., Haley, Koehne, Fulbright & Winniford, Waco, Tex., Coleman Hayes, Monnett, Hayes, Bullis, Grubb & Thompson, Oklahoma City, Okl., for plaintiffs.

John W. Swinford, Crowe, Boxley, Dunlevy, Thweatt, Swinford & Johnson, Oklahoma City, Okl., for defendant.

LANGLEY, Chief Judge.

The plaintiffs, Billy T. Adams and Herman Adams, are residents of Texas, where during the year 1962 Billy T. Adams was

engaged in the business of buying and selling cattle. Commencing in May of that year and continuing through November he made large purchases of cattle in Texas and shipped them to one H. C. Boyd at Clinton, Oklahoma. Except for the first few transactions, which were handled by check, payment for the cattle was accomplished by Billy T. Adams drawing a draft on Boyd at or about the time a shipment was made and depositing it in The First State Bank of Kosse, Texas. The draft was then forwarded for collection through an intermediate bank to the defendant herein, Bank of Hydro, an Oklahoma state bank located at Hydro in the Western District of Oklahoma. Adams was given credit by the Kosse bank for each draft at the time it was deposited. This was done in reliance on a general guaranty of all such drafts furnished the bank by his uncle, the plaintiff Herman Adams.

The first two such drafts were sent by the bank at Kosse to the Oklahoma City branch of the Federal Reserve Bank of Kansas City, Missouri, which forwarded them on to the Bank of Hydro. These drafts were accompanied by instructions from the Federal Reserve Bank to collect and remit on the day of receipt, which was done. Thereafter, all drafts were sent by the Kosse bank to the Citizens National Bank of Waco, Waco, Texas, where they were charged against the account of the Kosse bank and then forwarded to the Bank of Hydro for collection. The instructions accompanying the drafts read as follows:

"We enclose for collection items listed below. Do not protest any items except those bearing our instructions to 'Protest' or similar instruction of preceding endorser. Deliver documents only on payment of drafts. Return at once all unpaid items.

"Do not telegraph non-payment of items refused for endorsement; but certify before returning. Wire non-payment of all other items $1,000.00 and over giving the name of our depositor."

On this basis, Adams shipped a great many cattle to Boyd, who paid drafts totalling several hundred thousands of dollars through the Bank of Hydro. In the beginning the interval between the date of execution and the date of collection of the drafts ranged from three to seven days. During August this period increased to as many as eleven days. In September the shortest period was six days and the longest twelve days. In October, and in November prior to the collapse of the arrangment, the time taken to effect collection was from ten to eighteen days after execution. Finally, when a draft in the amount of $76,000.00 dated November 9, 1962 was still uncollected on November 28, 1962, an inquiry was begun by Billy T. Adams at the suggestion of the two Texas banks after they had discussed the situation with the Bank of Hydro, as a result of which it was ascertained that Boyd had neither the money with which to pay the draft nor the cattle on hand. In the meantime, during this period after November 9, while the $76,000.00 draft was still out, six additional shipments of cattle had been made and drafts executed and deposited. One of these was dated November 14 and was in the amount of $36,000.00, another was drawn on the same date in the amount of $30,000.00, another on November 15 in the amount of $42,000.00, one on November 20 for $20,145.61, one on November 21 for $12,258.34, and one on November 27 in the amount of $27,284.62. Two of these drafts, the one for $30,000.00 and the one for $42,000.00, were paid on November 27, and November 20, respectively, but the remaining four were not paid, and have not been paid. The total amount of the five unpaid drafts came to $171,688.77, but the plaintiffs succeeded in collecting $68,109.47 of this from Boyd, leaving a net loss of $103,579.30, to recover which this suit was filed.

The basis of the plaintiffs' claim against the Bank of Hydro is negligence. They claim that if the $76,000.00 draft had been returned promptly when Boyd failed to authorize payment, and if im-

mediate notice had been given, the cattle covered by the draft could have been secured from Boyd and the loss avoided, and that it was negligent of the bank not to do so. They claim further that the negligent handling of the draft resulted in their making the four subsequent shipments for which payment was not received; that upon prompt notice of the delinquency these shipments would not have been made and would not have been lost. It is the plaintiffs' contention that the draft, the handling of which is questioned, should have been returned by the Bank of Hydro when it was not paid within 24 hours from the time of receipt. Billy T. Adams testified that he expected all drafts to be paid within 24 hours and if not, presumably, to be returned by the Bank of Hydro. He stated further that he assumed Boyd either had the money or the financial backing to enable him to pay the drafts when received. This position is not borne out by the evidence, however.

It is clear from the testimony that all during the period the business relationship lasted Billy T. Adams was well aware that H. C. Boyd was financially incapable of honoring the drafts until he had sold the cattle. It is equally clear that Adams did not expect payment of the drafts until then; the time allowed without objection for payment of the drafts indicates as much. And Boyd testified that this was the case, arrived at by agreement between him and Adams, and that he so informed the Bank of Hydro. What then was the obligation of the Bank of Hydro in these circumstances?

The applicable statute respecting the duty of collecting banks in Oklahoma is 6 O.S.A. § 118d, which reads as follows:

"It shall be the duty of the initial or any subsequent agent collecting bank to exercise ordinary care in the collection of an item and when such duty is performed, such agent bank shall not be responsible if for any cause payment is not received in money or in unconditional credit given on the books of another bank, which such agent bank has requested or accepted. An initial or subsequent agent collecting bank shall be liable for its own lack of exercise of ordinary care but shall not be liable for the neglect, misconduct, mistakes or defaults of any other agent bank or of the drawee or payor bank. Laws 1937, p. 295 § 44."

The statutory duty of the Bank of Hydro, therefore, was to use ordinary care in the collection of the drafts. See Oklahoma Gas and Electric Company v. First National Bank of Oklahoma City, 179 Okl. 475, 66 P.2d 29. This included, of course, the duty to use ordinary care in carrying out the instructions accompanying the drafts. The forwarding instructions here were to "Return at once all unpaid items" and "Wire non-payment of all other items of $1,000.00 and over, giving the name of our depositor". But what is "at once", and when is an item to be considered as not paid? Obviously, if collection of the drafts could not be and was not expected to be effected until after the sale of the cattle covered by the drafts, then "at once" must have meant to the parties here involved some reasonable period for the sale to be accomplished, and "wire non-payment of all other items" must have referred to the failure of Boyd to take up the drafts after the expiration of such period. Just how long the Bank of Hydro should wait before wiring non-payment and returning a draft was never spelled out by the plaintiffs or by either of the forwarding banks. The only guide it had as to the time to allow for the payment of the $76,000.00 draft of November 9, 1962, was the experience of past similar transactions between Adams and Boyd which had been acceptable. This ran as high as 18 days, as pointed out above. A draft issued on November 1, 1962, in the amount of $42,500.00, for example, was paid 16 days later, on November 17; a draft issued on November 6, for $25,000.00, was paid November 24, 18 days after issue; and a draft executed November 7 for $37,799.95 was not paid until November 24, a period of 17 days. How much longer the Bank

of Hydro might have waited than it did before returning the $76,000.00 draft and giving notice of non-payment, and at what point it might have been considered negligent, is not an issue here; the plaintiffs and both forwarding banks learned of the non-payment on November 28, 19 days after execution. It is too much to say that waiting one day more for payment of the draft than it had previously waited constituted a failure to exercise due care.

The manner in which the drafts were handled prior to the $76,000.00 draft established a course of dealing, approved and acquiesced in by the plaintiffs and the forwarding banks, by which the Bank of Hydro was expected to continue its efforts to collect the drafts for periods of at least the length of those during which the drafts in question were held. In these circumstances, the handling of the $76,000.00 draft and the four other unpaid drafts executed subsequent to it did not represent lack of care or failure to use due diligence in effecting collection. Benthall v. Washington Hog Market, Inc., 257 N.C. 748, 127 S.E.2d 507. Since Adams knew that Boyd could not and would not pay the drafts until the cattle were sold, he in effect extended credit to Boyd for the purchase price of the cattle, and it was Boyd's credit failure that caused the loss to the plaintiffs, not any dereliction of duty on the part of the defendant bank.

As further defenses, the Bank of Hydro has urged that the business relationship between Billy T. Adams and H. C. Boyd was that of a partnership or joint venture, by reason of which it was not liable to the plaintiffs, and that in fact the plaintiffs suffered no actual loss as a result of any of its actions in handling the drafts in question. However, since the Bank of Hydro was not negligent in its handling of the drafts, it is not necessary to make a determination as to the validity of these defenses.

Judgment will be entered in favor of the defendant and against the plaintiffs.