**WILHELM FOODS, INC., Plaintiff,**

**v.**

**NATIONAL BANK OF NORTH AMERICA, Defendant and Third-Party Plaintiff,**

**v.**

**CENTAUR PACKING CO., INC., and Samuel Schweid, Third-Party Defendants.**

**No. 72 Civ. 1458.**

United States District Court,
S. D. New York.

Dec. 6, 1974.

Hahn, Hessen, Margolis & Ryan, New York City, for plaintiff; Francis J. Ryan, Jr., Daniel A. Zimmerman, New York City, of counsel.

Cole & Deitz, New York City, for defendant and third-party plaintiff; Edward N. Meyer, Joseph A. DiBenedetto, Robert D. Lang, New York City, of counsel.

Schmalholz & Plotkin, New York City, for third-party defendants; Albert I. Schmalholz, New York City, of counsel.

## OPINION FINDINGS OF FACT AND CONCLUSIONS OF LAW

EDWARD WEINFELD, District Judge.

Plaintiff Wilhelm Foods, Inc. ("Wilhelm"), a meat packer, commenced this action against National Bank of North America ("Bank") to recover $181,638.-80, the total of eight drafts drawn by plaintiff's predecessor, each of which covered shipments of meat to DaFran Meat Company, Inc. ("DaFran"), a meat jobber, which had a checking account at the Bank. The drafts were forwarded to defendant Bank for collection. Plaintiff claims that the Bank failed seasonably to dishonor the drafts and seeks recovery of damages for their face amount. Its complaint alleges four different causes of action. Prior to trial the court granted summary judgment in favor of the Bank upon the first cause of action, predicated upon the theory that the defendant was a payor bank. This court held otherwise—that the defendant was not the payor bank or the drawee of the drafts; that the drafts had been sent to the defendant for collection against the account of Da-Fran. Familiarity is assumed with the court's decision on that motion which sets forth some of the pertinent facts which are not in dispute.[1]

The case proceeded to trial upon the remaining three causes of action, which allege:

(1) that the Bank, which was a substantial secured creditor of DaFran, intentionally mishandled all the drafts to improve its own position;

(2) that the Bank negligently mishandled the drafts; and

(3) that the Bank's action was willful and malicious and warrants punitive damages.

The Bank, in addition to a denial of the essential allegations of these causes of action, pleads affirmative defenses of (1) election of remedies; (2) laches; (3) estoppel and (4) contributory negligence.

■ Preliminarily, the court disposes of a matter which was adverted to upon the trial. Included among plaintiff's claims is one for $22,541.76, the invoice price of a shipment of meat to DaFran on August 2, 1971. In this instance, unlike others here in suit, no draft was ever forwarded to the Bank. Plaintiff seeks to justify this claim upon a theory of "consequential" damages. Whatever the theory, there is not the slightest basis for recovery, since the shipment was on its way before the first draft reached the Bank, and the Bank had no relationship to the shipment of any kind.

As described in the court's opinion on the summary judgment motion, prior to the time of the shipments involved in this suit, the plaintiff had sold meat to DaFran on open account. Payment on those transactions had been due in seven to ten days following receipt of the shipment. In late July, 1971, the defendant was slow in its payments on the outstanding open account, and plaintiff decided to utilize "sight" drafts to obtain payment for each shipment thereafter sold to DaFran. On July 29 Wilhelm notified the Bank it was considering placing DaFran on a sight draft basis, and the Bank's representative stated there would be no problem with Da-Fran's credit worthiness. Thereupon, a day, and in some instances several days, after a shipment was on its way plaintiff drew a draft for the amount of the shipment and deposited it with one or the other of its local banks in Denver, Colorado, which in turn airmailed the draft along with a "letter of transmittal" to the defendant Bank. Each shipment continued to go forward from Denver to DaFran by truck or carrier as in the past, and an invoice was mailed to

---

1. Wilhelm Foods, Inc. v. National Bank of North America, 382 F.Supp. 605 (S.D.N.Y., 1974).

DaFran the day shipment left plaintiff's premises. Deliveries of the shipments continued to be made to DaFran in the same manner as under the open account without requiring prior payment from DaFran.

DaFran, in addition to its deposits with the Bank, also had a substantial line of credit there which was secured by DaFran's accounts receivable, inventory and other assets. DaFran's place of business was in the Bronx, located nearby the Bank's branch in that borough; its checking account was at the Bank's 38th Street branch in the Borough of Manhattan; and the credit line was serviced at another branch in Manhattan. All drafts wherein DaFran was the drawee were received by the Bank's 38th Street branch, but under its procedure they were delivered the next day to the Bronx branch to facilitate payments by DaFran. The drafts were entered in a log maintained at the Bronx branch pending instructions by DaFran to the Bank at its credit office whether or not to pay the drafts. When payment was authorized, DaFran would deliver its check at the Bronx branch payable to the Bank, which would then issue its cashier's check to the forwarding bank.

Between July 28 and August 12 Wilhelm made the eight shipments to DaFran for a total invoice price of $181,638.80, covered by drafts which were received by the Bank between August 3 and August 17. The shipments were received by DaFran, but it never authorized the Bank to make payments of those drafts. The Bank retained all drafts until they were returned to the forwarding Denver banks; three were received by one Denver bank on August 23 with the notation on the drafts "no authority to pay"; the five others were received by the other Denver bank on August 24. Soon after the return of the drafts DaFran ceased doing business, its creditors held a meeting and agreed upon a common law composition for thirty cents on the dollar, which plaintiff accepted on September 25, 1971, and pursuant to which it received $61,307.70. Plaintiff now seeks to recover the unpaid balance of $120,331.10 from the Bank upon a claim that its actions caused the loss.

 It appears that shortly before and during the period in question, when drafts were drawn by other meat shippers upon DaFran, they were retained by the Bank for extended periods, in one instance as long as twenty-five days, pending DaFran's authorizing payment, which it always did; and so it was customary to await such authorization instead of returning the drafts. But the Bank's practice in retaining drafts of other meat packers until DaFran authorized payment does not define the Bank's duty to plaintiff with respect to the drafts it submitted for collection. The Bank's duty to act "seasonably" is defined as follows:

"A collecting bank taking proper action before its midnight deadline following receipt of an item, notice or payment acts seasonably; taking proper action within a reasonably longer time may be seasonable but the bank has the burden of so establishing."[2]

Thus, whether the Bank acted seasonably, that is, used ordinary care in handling plaintiff's drafts, is to be determined upon all the facts and surrounding circumstances.[3]

 The Bank's prior experience with and relationship to its depositor may be considered on the issue of whether the Bank acted reasonably.[4] At

2. N.Y.U.C.C. § 4–202(2) (McKinney's 1964). § 4–104(1)(h) provides:

" 'Midnight deadline' with respect to a bank is midnight on its next banking day following the banking day on which it receives the relevant item or notice or from which the time for taking action commences to run, whichever is later . . . ."

3. *Cf.* Florida Citrus Exchange v. Union Trust Co., 244 App.Div. 68, 278 N.Y.S. 313 (4th Dep't 1935).

4. *Cf.* Adams v. Bank of Hydro, 239 F.Supp. 987 (W.D.Okl.1965); Benthall v. Washington Hog Market, Inc. 257 N.C. 748, 127 S. E.2d 507 (1962).

or about the period in question, DaFran was making substantial purchases from other meat packers, as well as from the plaintiff, and those other purchases ran into substantial sums, approximating those involved in the shipments by plaintiff to DaFran. The Bank's log of the drafts covering those purchases shows that in those other instances the Bank retained the drafts from four to as long as twenty-five days before DaFran authorized payment. This evidence establishes that although DaFran was a slow payer, which plaintiff well knew, it was then paying its bills.

■ In the instance of the drafts at issue, DaFran did not instruct the Bank to dishonor or return the drafts; its instructions were to hold them—not unusual in the light of its handling of the drafts of other shippers. Obviously, when DaFran did not promptly authorize payment, the Bank's safest course to insulate itself against liability would have been to return the drafts within the midnight deadline. But it does not follow that the Bank's failure to return the drafts immediately was negligent. Plaintiff was interested in payment; and for the Bank to have returned each

draft by the midnight deadline would not have achieved that result. Its retention of drafts pending DaFran's authorization for payment cannot be said to be unreasonable or negligent in the light of the Bank's knowledge that, under similar circumstances DaFran did not at once authorize payment of other shippers' drafts, but did so after some delay, in one instance as long as twenty-five days. Moreover, the evidence permits a finding that DaFran could not pay for the merchandise until it was sold and that in fact it used the proceeds of the sales to pay plaintiff the outstanding balance on the open account. Upon all the circumstances, it cannot be said that the Bank failed to return the drafts seasonably or to use ordinary care in handling them.

■ But assuming that the Bank did not use ordinary care, the issue remains whether its conduct was the cause of plaintiff's loss of the balance due upon the unpaid invoices.[5] As shown by the following schedule, most of plaintiff's shipments were delivered to DaFran before the Bank received the corresponding drafts, except in one instance the shipment was received the same day, and in another the day before:

| Inv. Amt. and Date | | Del. to Carrier | Amount of Sight Draft and Date | | Date of Transmittal of Draft to Bank | Date of Delivery of Shipment to DaFran | Date of Receipt of Draft by Bank |
|---|---|---|---|---|---|---|---|
| $ 21,477.52 | 7/28 | 7/28 | $ 43,480.64 | 7/29 | 7/29 | 8/2 | 8/3 |
| 22,003.12 | 7/28 + | 7/28 | | | | | |
| 20,347.01 | 7/29 | 7/29 | 20,347.01 | 7/30 | 7/30 | 8/2 | 8/3 |
| 13,827.80 | 7/30 | 7/30 | 13,827.80 | 7/30 | 8/2 | 8/3 | 8/4 |
| 21,775.20 | 8/4 | 8/4 | 21,775.20 | 8/4 | 8/5 | 8/9 | 8/9 |
| 965.64 | 8/5 | None * | 965.64 | 8/6 | 8/6 | | 8/11 |
| 23,202.56 | 8/6 | 8/6 ** | 44,746.80 | 8/9 | 8/10 | 8/10 | 8/12 |
| 21,544.24 | 8/6 | 8/6 ** | | | | | |
| 22,282.39 | 8/11 | 8/10 | 22,282.39 | 8/11 | 8/11 | 8/16 | 8/15 |
| 14,213.32 | 8/12 | 8/12 | 14,213.32 | 8/13 | 8/12 *** | 8/16 | 8/17 |

$181,638.08 Total of Unpaid Invoices

+ Separate shipping documents

\* Correction of $21,775.20 invoice dated 8/4

\*\* Same shipping documents

\*\*\* Although the transmittal notice is dated August 12, it refers to a draft dated August 13

———◆———

5. The Uniform Commercial Code provides: "The measure of damages for failure to exercise ordinary care in handling an item is the amount of the item reduced by an amount which could not have been realized by the use of ordinary care, and where there is bad faith it includes other damages, if any, suffered by the party as a proximate consequence." N.Y.U.C.C. § 4–103(5) (McKinney's 1964).

In each instance DaFran was in possession of the shipment before the expiration of the Bank's midnight deadline as to the covering draft. Thus there is no basis to sustain the claim that the Bank's failure to act upon the draft within the midnight deadline was the direct cause of any loss sustained on the shipment corresponding to that draft. The only question is whether the Bank's handling of the drafts was a cause in any other way of plaintiff's losses.

Reference to the above schedule indicates that by the time the Bank received the first three drafts (August 4) the first four shipments thereunder, which had been delivered to the carrier on July 28, 29 and 30, were already in DaFran's possession. Thus, as to these shipments totalling $77,665.45 there is no basis for any finding that the Bank's failure to return the drafts before the "midnight deadline" was the cause, direct or indirect, of any loss sustained by plaintiff.

Additionally, it appears that even had the Bank airmailed notice of non-collection or dishonor to the Denver forwarding bank in strict compliance with the midnight deadline, the notice would not have reached the Denver forwarding bank until after plaintiff had made one shipment on August 4 for $22,740.84 and two shipments on August 6 totalling $44,746.80.[6] The drafts for those shipments did not reach defendant until August 9 and 12, respectively. Moreover, plaintiff during this period was making frequent inquiry of its Denver banks and knew the drafts had not been paid, but made no attempt to intercept the shipments. So, too, as to these shipments there is no basis to support the claim that defendant's failure promptly to notify the Bank that the drafts had not been paid led plaintiff either to make the shipments or not to intercept them once they were in transit.

There remain two final shipments, one on August 10 for $22,282.39 and the last one on August 12 for $14,213.32, the drafts for which were received by the Bank on August 15 and August 17. Plaintiff, of course, well knew by the time it sent these shipments that none of the drafts covering the prior shipments had been paid. It had been in constant touch with its Denver banks and was so informed; its credit manager was fully aware of the non-payment of all drafts previously drawn; in addition, a representative of plaintiff called DaFran on August 11 and was advised there was no problem with the sight drafts—that they would be paid. Implicit in this testimony is an awareness on the part of plaintiff's representative that DaFran had not yet authorized payment of any of the drafts. The totality of evidence requires a finding that the failure of the Bank to return the drafts by the midnight deadline or seasonably thereafter played no part in plaintiff's original shipments or in its continuing shipments to defendant, and that the loss by reason of non-payment of the invoices was due to plaintiff's extension of credit to DaFran and not to any dereliction on the part of the Bank.

Plaintiff's claim that had the Bank notified it seasonably of the non-payment of each draft it would not have made additional shipments and would have sought to reclaim those that were in transit, and even those in possession of DaFran has a hollow ring and is unrealistic; its own conduct requires rejection of this hindsight contention. When, on July 28, plaintiff decided on the draft procedure, DaFran owed it a considerable sum for past shipments on open accounts, $228,765.50—yet it continued thereafter to deliver meat as in the past. Plaintiff could have attached bills of lading to the drafts covering the shipments with the requirement that DaFran pay the drafts before obtaining the shipment. But it did not do so; it continued to extend credit to DaFran, which was reducing its past indebtedness on open account. Thus, on July 28, 1971, plaintiff received from DaFran

---

6. The schedule indicates that the drafts and transmittal notions from the Denver bank to defendant averaged 3 to 4 days in transit.

$40,172.67; on July 30, $21,135.63; and on August 2, $20,814.34. Payments in reduction of the open account continued thereafter. On August 4 plaintiff received $382.82, followed by a payment on August 9 of $42,573.67; on August 10 of $22,147.89; on August 13 of $60,498.-86; on August 19 of $19,154.32; and on August 27 a final payment of $1,344.82. These payments exceeded the total value of the shipments covered by the drafts. The entire open account indebtedness was paid in full—all that remained outstanding were the amounts due for the shipments made under the so-called sight draft method for which plaintiff now seeks to hold the Bank.

Plaintiff had the opportunity to attempt to reclaim some of the merchandise if it discovered that DaFran was insolvent.[7] On August 24, when the final drafts were returned to plaintiff, it had at least two days to attempt to reclaim the goods shipped on August 16. However, it took no action, nor did it even contemplate action. There is no reason to assume that it would have acted differently as to the earlier shipments if the drafts had been returned at an earlier time. Had plaintiff attempted any such action, even assuming it had a legal basis for doing so, DaFran would no longer have made the payments on the open account balance, the funds for which were derived from the draft shipments.

The compelling facts that emerge from the record are that while DaFran was not making payments on plaintiff's drafts, it was making regular, substantial payments on its prior outstanding account; that plaintiff, aware of this situation, continued to extend credit to DaFran in reliance on DaFran's continued payments on its open account, and in the expectation that DaFran would soon make payments on the outstanding drafts; and that when the drafts were finally returned by the Bank, plaintiff did not attempt to reclaim any goods from DaFran, as it claims it would have, had the Bank returned the drafts promptly. The record warrants a finding that plaintiff would have continued to make each shipment to DaFran whether or not the Bank had returned each draft seasonably. As the credit manager testified, plaintiff had no concern about DaFran's financial situation; it never considered cutting DaFran off completely. Immediate return of the drafts would not have caused plaintiff to withhold its extension of credit to DaFran, any more than plaintiff's conclusion that DaFran was a "slow payer" on its open account caused it to withhold extension of credit. The court concludes that it was plaintiff's extension of credit to DaFran and DaFran's financial condition that caused plaintiff's losses, not any negligence, dereliction or other conduct on the Bank's part.[8]

■ Moreover, the measure of damages for the failure to use ordinary care in handling drafts is "the amount of the item reduced by an amount which could

---

7. The Uniform Commercial Code provides: "(2) Where the seller discovers that the buyer has received goods on credit while insolvent he may reclaim the goods upon demand made within ten days after the receipt, but if misrepresentation of solvency has been made to the particular seller in writing within three months before delivery the ten day limitation does not apply. Except as provided in this subsection the seller may not base a right to reclaim goods on the buyer's fraudulent or innocent misrepresentation of solvency or of intent to pay. "(3) The seller's right to reclaim under subsection (2) is subject to the rights of a buyer in ordinary course or other good faith purchaser under this Article (Section 2–403). Successful reclamation of goods excludes all other remedies with respect to them." N.Y.U.C.C. § 2–702(2), (3) (McKinney's 1964).

Plaintiff's objection that any such attempt would have been unfruitful because DaFran would have immediately resold the goods as it received them, if valid here, would be equally valid in response to plaintiff's contention that it would have sought reclamation if it received the drafts at an earlier date.

8. *See* Adams v. Bank of Hydro, 239 F.Supp. 987, 990 (W.D.Okl.1965); Benthall v. Washington Hog Market; Inc., 257 N.C. 748, 127 S.E.2d 507 (1962); Crouse v. First Nat'l Bank, 137 N.Y. 383, 33 N.E. 301 (1893).

not have been realized by the use of ordinary care."[9] Even had the Bank promptly returned each draft, plaintiff obviously would not have realized anything on them. It would have had in its possession the returned drafts with the notation "no authority to pay." However, plaintiff contends that it is entitled to recover consequential damages, such as the losses sustained by reason of the plaintiff's continuing to make shipments and refraining from action to reclaim goods already shipped, because the Bank's conduct was marked by bad faith.[10] The court has already concluded that these consequential damages were not caused by the Bank's conduct; but even if they were, the plaintiff could not recover them, because it has not made the necessary showing of bad faith.

■ Plaintiff charges that the Bank held the drafts in order to improve its own security position by the increase in the assets of DaFran resulting from the shipments. It has failed to sustain its burden of proof as to this claim. While it is true DaFran reached its credit maximum, the Bank at all times had ample security to protect itself against loss. The fact is that after payment of DaFran's indebtedness to the Bank there was a substantial excess of collateral which was released to DaFran and utilized to meet the greater portion of the payments due to creditors under the composition agreement.

Finally, even if the record permitted a finding that the Bank was negligent, then under all the circumstances a finding would also be required that plaintiff itself was negligent. Plaintiff shifted to the draft procedure on July 28 because DaFran had piled up a large indebtedness, and plaintiff sought thereby to accelerate payment for subsequent shipments by drawing drafts instead of awaiting payment by check. As already noted, it could have drawn a sight draft with bill of lading attached so that DaFran could not have obtained possession and title to the shipments without prior payment. Instead, it continued its shipments as in the past under a practice that permitted DaFran to obtain the merchandise without prior payment.

Upon all the evidence I find plaintiff has failed to sustain its claims:

(1) that the Bank intentionally mishandled all drafts to improve its own position;

(2) that the Bank was negligent;

(3) that the Bank's action was willful and malicious; and

(4) that any damages were caused by the Bank's conduct.

Since there has been no recovery against the Bank, it follows that, without consideration of the merits of the Bank's third-party complaint, the third-party defendants, Schweid and Centaur Packing Co., Inc., are entitled to judgment in their favor.

Judgment may be entered accordingly.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law.

---

9. Note 5 *supra.*

10. *See* note 5 *supra.*