Alexander Berman, J.
$14,835,917,339,000., an impressive *1034 amount, even in an age of superlatives. It represents the total dollar value of commercial paper cleared through the 16 Federal Reserve Banks in the major cities of the United States during the 1975 calendar year. In New York City alone, the average daily exchange at the New York Clearing House amounts to $5,642,306,382.51. Each day, then, more than five billion dollars changes hands in the metropolitan area by means of abstract transactions involving bank debits and credits. Were "hard cash” required for each of the transactions involved, the economy of this country would grind to a halt. It is apparent that regardless of the relative merits of gold in times of distress, in a functional economy paper is king.
This fluidity of exchange is made possible by the country’s "banking system.” It provides the machinery and the personnel which makes the transfer of funds possible and workable.
Any check, be it a $10 cash item scrawled during a night on the town or a multimillion dollar item given to close a corporate merger finds its way into what is known as the "collection process.” On the surface the process appears deceptively simple. Under normal circumstances a check is deposited by the payee in his bank and a conditional credit is made to his account. Some two or three days later, those funds are available for withdrawal. On occasion, a depositor will receive a notice that the check which he deposited has been returned by the maker’s bank because it was drawn on "insufficient” or "uncollected” funds. Often, in the normal course of events, after a large amount of energy has been expended in rather heated discussions with the maker and a number of truly imaginative excuses has been given, the payee is prevailed upon to redeposit the check which then hopefully clears.
The steps between deposit and final payment are many of few depending on the individual circumstances. The number of banks actually involved in the collection can range from one, as in the case of a check drawn on the bank in which it is deposited, to half a dozen, as in the case where a check is drawn on an out-of-State bank and intermediary banks are required for collection. The banks perform different functions at different times and can, in certain instances, perform different functions simultaneously. Each of the functions gives rise to separate responsibilities. Key to the workings of the system are the Federal Reserve Bank and the local clearing houses. These perform the vital function of servicing the local *1035 banks within their geographic area and act as a master correlator and dispatcher. They are the indispensable middlemen in the process around which all of the collection activity revolves. Checks drawn on banks other than the bank in which they are deposited are forwarded to them for distribution to the banks upon which they are drawn for payment or rejection. They are also the conduit through which unpaid items are returned.
It is apparent that were each jurisdiction permitted to have its own rules and regulations fixing the rights and obligations of the various parties, chaos would result and the integrity and free exchange of commercial paper would be undermined. It is just such a chaotic situation which prompted a majority of the States to enact the Uniform Commercial Code, more particularly, article 4 thereof (Bank Deposits and Collections). Article 4, which was enacted in this State in 1962 to take effect on September 27, 1964 (L 1962, ch 553), is divided into five parts and deals with the collection process and the relationship between banks and their customers. Part 1 (§ 4-101 through § 4-109) defines the various capacities of the banks involved in a particular transaction and sets forth general provisions with respect to receipt of items, delays and posting; part 2 (§ 4-201 through § 4-214) deals with depositary banks and collecting banks; part 3 (§ 4-301 through part 3 (§ 4-30.1 through § 4-303) deals with payor banks; part 4 (§ 4-401 through § 4-407) deals with the relationship between payor banks and their customers; and part 5 (§ 4-501 through § 4-504) deals with the collection of documentary drafts. Some of the relevant definitions contained in article 4 are: a payor bank is defined as a "bank by which an item is payable as drawn or accepted” (Uniform Commercial Code, § 4-105, subd [b]); a depositary bank is the "first bank to which an item is transferred for collection even though it is also the payor bank” (Uniform Commercial Code, § 4-105, subd [a]); a collecting bank is "any bank handling the item for collection except the payor bank” (Uniform Commercial Code, § 4-105, subd [d]); a presenting bank is "any bank presenting an item except a payor bank” (Uniform Commercial Code, § 4-105, subd [e]). A banking day is defined as "that part of any day on which a bank is open to the public for carrying on substantially all of its banking functions” (§ 4-104, subd [1], par [c]). The term "midnight deadline,” which has particular significance to this opinion, is defined as the "midnight on its next banking day *1036 following the banking day on which it [payor bank] receives the relevant item or notice or from which the time for taking action commences to run, whichever is later” (§ 4-104, subd [1], par [h]).
Of paramount importance to the holdings here are the provisions of section 4-302, which read as follows:
"Payor Bank’s Responsibility for Late Return of Item
"In the absence of a valid defense such as breach of a presentment warranty (subsection (1) of Section 4-207), settlement effected or the like, if an item is presented on and received by a payor bank the bank is accountable for the amount of
"(a) a demand item other than a documentary draft whether properly payable or not if the bank, in any case where it is not also the depositary bank, retains the item beyond midnight of the banking day of receipt without settling for it or, regardless of whether it is also the depositary bank, does not pay or return the item or send notice of dishonor until after its midnight deadline; or
"(b) any other properly payable item unless within the time allowed for acceptance or payment of that item the bank either accepts or pays the item or returns it and accompanying documents.”
The court has set forth this rather lengthy background material in order to place the issues involved in this case in their proper perspective. We now turn to the motions before this court, and the facts giving rise to the two actions involved.
In the early part of 1972, Met Food Corp. and Met Frozen Foods Corp. were transacting business on a daily basis with Skilmart’s Supermarkets, Inc. These actions arise out of 15 checks of Skilmart’s, totaling $215,884.34, drawn in March of 1972 on its account at National Bank of North America (National) and payable to either Met Foods or Met Frozen and deposited at Bankers Trust or Manufacturers Hanover. The checks were then transmitted to the New York branch of the Federal Reserve, where they were forwarded to National. They were subsequently dishonored by National and returned to the Fed for retransmittal to the forwarding banks. It appears that at the times involved, National was utilizing the assets of Skilmart on deposit with it as a setoff against moneys owed by Skilmart. On April 5, 1972, within 15 days of the *1037 periods involved, Skilmart filed a chapter XI bankruptcy petition, and was subsequently adjudicated a bankrupt. (It should be noted that details with respect to what transpired in that proceeding are virtually nonexistent).
These actions followed. In each, the complaint alleges three causes of action — the first, for wrongful cancellation and return of the checks; the second, on the checks themselves on the grounds that dishonor was untimely; and third, on the grounds of a conspiracy between the banks involved. The answers which contain denials of the material allegations of the complaint do not contain affirmative defenses or counterclaims. The answer of Bankers Trust does, however, contain a cross claim against National. The court now has before it a motion by plaintiffs and cross motion by defendants for summary judgment in each of the actions. Before reaching the merits of these motions, it should be pointed out that counsel for defendant National, despite the apparent conflict of interest, represents all of the banks involved, and any subsequent reference to defendant in this opinion shall be taken to mean National Bank of North America.
Of the three causes of action, only plaintiffs’ claims with respect to liability under section 4-302 merits discussion. Because of the similarity of the claims and the defenses thereto, the court will, before reaching the factual details of the individual transactions, deal first with the question of plaintiffs’ rights against National.
It is clear that if plaintiffs can establish that National (a payor bank) failed to timely return a check of Skilmart’s within the deadline set forth in section 4-302 (midnight of the banking day following receipt) it, National, is liable for the face amount of the item (see Sunshine v Bankers Trust Co., 34 NY2d 404; Fromer Distrs. v Bankers Trust Co., 36 AD2d 840; Rock Is. Auction Sales v Empire Packing Co., 32 Ill2d 269; United States v Loskocinski, 403 F Supp 75) less any payment received (see Uniform Commerical Code, § 4-213).
The official comments to section 4-302 state that its purpose is to prescribe time limits within which a payor bank must take action if it receives an item payable by it. While the section is silent as to the sanctions imposed if there is a failure to timely return, it is clear that liability should be measured by the instrument itself. A failure to return is, in effect, payment of the item (see Uniform Commercial Code, § 4-213, subd [1], par [d]). Once payment has been made it *1038 cannot be said that a payor bank’s liability is anything other than the face amount of the instrument. As Official Comment No. 7 to § 4-213 notes: "[T]he payor bank shall be accountable for the amount of the item. It is not made accountable if it has paid the item in cash because such payment is itself a sufficient accounting. The term 'accountable’ is used as imposing a duty to account, which duty is met if and when a settlement for the item satisfactorily clears.”
In addition, the code and Official Comments, with certain exceptions (see Official Comment No. 2 to § 3-409), make reference to a payor bank’s "accountability” for the amount of a demand item. While it is true that the word "accountability” has, since the decision in Rock Is. Auction Sales v Empire Packing Co. (supra) been interpreted as being synonymous with the term "liable”, it should be pointed out that the term "accountable” implies something stronger. A person accounts for property that is not his own. Such a strict interpretation is consistent with the mechanics of the collection process. It is at the point where a payor bank either rejects or accepts an item drawn on it, that the collection process reversed and begins to complete the circle.
The court is aware of the fact that a payor bank is placed in a rather precarious position. It must act and act quickly under rather hectic conditions to protect itself against incurring substantial liabilities. However, the integrity of the entire system and of commercial paper itself requires that someone bear a risk. The Uniform Commercial Code has quite logically placed the risk upon the obvious party. As Judge Schaefer noted in Rock Is. Auction Sales v Empire Packing Co. (32 Ill2d 269, 273): "But the legislature may legitimately have concluded that there are differences in function and in circumstance that justify different consequences. Depositary and collecting banks act primarily as conduits. The steps that they take can only indirectly affect the determination of whether or not a check is to be paid, which is the focal point in the collection process. The legislature could have concluded that the failure of such a bank to meet its deadline would most frequently be the result of negligence, and fixed liability accordingly. The role of a payor bank in the collection process, on the other hand, is crucial. It knows whether or not the drawer has funds available to pay the item. The legislature could have considered that the failure of such a bank to meet its deadline is likely to be due to factors other than negli *1039 gence, and that the relationship between a payor bank and its. customer may so influence its conduct as to cause a conscious disregard of its statutory duty.”
Turning now to the arguments, other than the existence of factual issues, urged by defendant in opposition to the plaintiffs’ motions for summary judgment, and in support of its cross motions. First, it argues that, assuming an untimely return, the complaints should be dismissed because they fail to allege that plaintiffs sustained any damage. This argument is based primarily upon the provisions of subdivision (5) of section 4-103 of the Uniform Commercial Code and the holding in Wilhelm Foods v National Bank of North Amer. (388 F Supp 1376). Subdivision (5) of section 4-103 provides that the liability of a bank which fails to exercise ordinary care in handling an item is limited to the "amount of the item reduced by an amount which could not have been realized by the use of ordinary care”.
In a rather intriguing argument defendant contends that plaintiffs cannot establish that they have been damaged. It argues that due to the short period of time between dishonor and Skilmart’s bankruptcy, plaintiffs would have been unable, assuming a timely return, to have obtained a judgment against Skilmart and even assuming payment, plaintiffs would not have been able to retain the moneys received since payment would represent a voidable preference, as against Skilmart’s other creditors. This argument might merit serious consideration if National were acting as a "depositary” or a "collecting” bank, as was the case in Wilhelm Foods (supra). However, here, since defendant was a payor bank its obligations were prescribed by section 4-302, which, as previously noted, requires return to be made within a specified time and sets the measure of damages.
The issue of whether payment by defendant of the checks in question would result in plaintiffs’ obtaining a preference over Skilmart’s other creditors is not properly before this court. It has not been established that defendant is a creditor of Skilmart, nor are these actions the appropriate forum for making such a determination. That issue may become relevant if and when a recovery is obtained.
Second, defendant seeks to defeat plaintiffs’ motions on the ground that they are premature. It is argued that assuming liability on the checks, discovery should be had in order that it, National, may determine if any claims exist in favor of *1040 Skilmart against the plaintiffs. In essence, a claim that as a potential subrogee, it is entitled to determine what, if any, defenses exist with respect to the underlying transaction. This argument is rejected. It must be assumed that if, in fact, such defense existed, they would have been litigated in the bankruptcy proceeding. It should also be noted that there is no indication that such claims exist nor are there affidavits from a former officer or employee of Skilmart to evidence the possibility of such claims (see Latham Motors v Blackmer & Sons, 56 Misc 2d 631).
In any event, defendant has failed to establish a right of subrogation. It is axiomatic to state that in order to "stand in someone’s shoes” a party must establish his right to be there. Section 4-407 provides such standing when a payor bank "has paid an item over the stop payment order of the drawer or maker or otherwise under circumstances giving a basis for objection by the drawer or maker, to prevent unjust enrichment and only to the extent necessary to prevent loss to the bank by reason of its payment of the item” (emphasis added).
Defendant has failed to establish that section 4-407 is applicable to the present situation. There is no issue with respect to stop payment notices by Skilmart nor has defendant raised any issue with respect to its liability over to Skilmart because of its payment of the checks (unauthorized signature, forgery, knowledge of defense, etc.). The loss, if any, which woud result from an imposition of liability against National would be a diminution of its previously exercised right of setoff. While technically this would be a "loss to the bank by reason of its payment of the item,” it is not the loss contemplated by section 4-407.
The protection afforded by section 3-302 (holder in due course) and section 4-401 (charging the maker’s account, etc.) is an adequate safeguard against a payor’s bank being required to make payment in situations where it has failed to timely return an item. The situation here is complicated by the fact of Skilmart’s bankruptcy. However, that circumstance should not be used as a vehicle to expand National’s rights under section 4-407.
On the question of unjust enrichment, the only enrichment which would result, if an untimely return is established, and recovery is not allowed, is the enrichment of National. The court would be sanctioning a violation of the provisions of section 4-302, and in effect, be allowing a setoff against funds *1041 belonging to plaintiffs when they were not indebted to the payor bank.
In reaching its determination, the court is aware of the holding in AH-RS Coal Corp. v Farmers Nat. Bank (63 Pa D & C 203). That holding is, however, not binding on this court.
Before reaching the question of whether there are factual issues which would bar summary relief as to the various items, or delay entry of judgment with respect thereto, the court will briefly discuss the defense of waiver raised as to checks Nos. 4135, 4136, 4137 and 4139, which were redeposited by Met after they had been returned unsatisfied. The debit memo accompanying the return indicates the funds were supposedly drawn on "uncollected funds,” even though the documentary evidence submitted indicates sufficient funds on hand for the checks to be honored. It cannot be said then that plaintiffs were relinquishing a known right when they redeposited the items. (S. & E. Motor Hire Corp. v New York Ind. Co., 255 NY 69.) Establishing that there has, in fact, been an untimely return by a payor bank is difficult enough under the best of circumstances. A payee should not be required to look beyond the reasons given for the return by the payor bank.
The only question remaining open is whether under the facts of each individual transaction, any of the parties are, as a matter of law, entitled to summary judgment. In the opinion of the court, Met Food Corp. is entitled to recover against National on checks Nos. 4135, 4136, 4137, 4138, 4139 and 4140, and Met Frozen Food Corp. is entitled to recovery on check No. 3306. The dates of receipt from and return to the Federal Reserve are taken from National’s records. It is clear that these items were not returned within the limits prescribed by section 4-403, thus rendering National liable for the face amount of those items less any payments received with respect thereto. It is this latter prospect which precludes entry of judgment at this time.
As previously noted, Skilmart was involved in a chapter XI proceeding. Throughout this opinion it has been assumed that plaintiffs have submitted claims as creditors of Skilmart and that some arrangement has been reached in that proceeding. The record before the court is barren with respect to the details of compromise. It might be that plaintiffs reached a partial payment or that they received payment by alternate means which would require a valuation. The court, therefore, will direct that entry of judgment with respect to the items on *1042 which summary judgment has been granted shall be held in abeyance pending a hearing on the issue of such payment (CPLR 3212, subd [c]), or the present value of any alternate means of payment. The order to be settled hereon shall provide for the holding of a hearing on that issue at Special Term, Part II.
As to the remaining checks, the motions for summary judgment are denied on the grounds that there are factual issues present with respect to retention past the "midnight deadline” which preclude a summary disposition. While the court finds it unusual that National cannot produce records of its returns and notes the existence of apparent inconsistencies, the court will not inquire into the issue of credibility (Glick & Dolleck v Tri-Pac Export Corp., 22 NY2d 439).
Defendant is entitled to summary judgment dismissing plaintiffs’ remaining causes of action for wrongful dishonor and conspiracy. An agreement between a payor bank and its customer does not create a cause of action in favor of a holder of a check in the event the payor bank fails to honor a check (see Garden Check Cashing Serv. v First Nat. City Bank, 25 AD2d 137, affd 18 NY2d 941). Not only have plaintiffs failed to submit any evidence of a conspiracy, the complaints as presently pleaded fail to state a cause of action (Health Delivery Systems v Sheinman, 42 AD2d 566).