**FIDELITY AND DEPOSIT COMPANY OF MARYLAND, Appellant,**

v.

**The BANK OF BLADENBORO, a North Carolina Corporation, Wachovia Bank & Trust Company, N. A., a North Carolina Corporation, the Federal Reserve Bank of Richmond, Virginia, a United States Corporation, the Federal Reserve Bank of Richmond, Virginia, Charlotte, North Carolina Branch, Jerry Richardson and Charles S. Bridger, Appellees.**

No. 78–1221.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 10, 1979.

Decided April 20, 1979.

Lonnie B. Williams and Jerry C. Woodell, Wilmington, N. C. (Marshall, Williams, Gorham & Brawley, Wilmington, N. C., on brief), for appellant.

William L, Hill, II, Wilmington, N. C. (Cyrus D. Hogue, Jr., Hogue, Hill, Jones, Nash & Lynch, Wilmington, N. C., on brief), for appellees, The Bank of Bladenboro and Charles I. Bridger.

Karl W. McGhee, Wilmington, N. C. (Stevens, McGhee, Morgan & Lennon, Wilmington, N. C., on brief), for appellee, Wachovia Bank & Trust Company, N. A.

David A. Harlow, Fayetteville, N. C. (Nance, Collier, Singleton, Kirkman & Herndon, Fayetteville, N. C., on brief), for appellee, Jerry Richardson.

James C. Fox, Wilmington, N. C. (Murchison, Fox & Newton, Wilmington, N. C., on brief), for appellees, Federal Reserve Bank of Richmond, Virginia, and Federal Reserve Bank of Richmond, Virginia, Charlotte, North Carolina Branch.

Before WINTER, HALL and PHILLIPS, Circuit Judges.

WINTER, Circuit Judge:

Clarendon Bank & Trust Company (CB&T) recovered from its insurer Fidelity & Deposit Company of Maryland (F&D) losses that CB&T sustained when it permitted its depositor Car Retailers to draw on drafts deposited to its account which were subsequently dishonored because the authority of the agent to draw them had been

revoked. *Clarendon Bank & Trust v. Fidelity & Deposit Co. of Md.*, 406 F.Supp. 1161 (E.D.Va.1975). F&D, having paid the losses and having been subrogated to CB&T's rights, sued various banks which had participated in the collection process asserting that their negligence in the collection process and in advising CB&T that the drafts were dishonored caused CB&T's losses.[1] The district court granted summary judgment for defendants ruling that in notifying Wachovia, its immediate transferor, of the delay in processing the items and in presenting the items for payment, Charlotte Federal Reserve was negligent but that CB&T's contributory negligence barred it and its insurer from recovery. We affirm. We rule that under the facts of this case CB&T was contributorily negligent as a matter of law and was thereby barred, under what we perceive to be the applicable North Carolina law, from any recovery from defendants.

## I.

Many of the facts of this case are set forth in the reported opinion of the district court in the previous case and we will not repeat all of them here. The case arises out of an arrangement under which Car Retailers financed its purchase of used cars at "wholesale," which it thereafter sold to other dealers, by drawing drafts on Richardson's Used Cars, Inc. (RUCI) "collectible through" Bladenboro and depositing them in its account in CB&T. Happily for Car Retailers but ultimately unhappily for CB&T, CB&T permitted Car Retailers immediately to draw against these drafts in payment of its purchases. RUCI provided Jules Williamson of Car Retailers blank forms in three parts. The first was a blank draft on RUCI's account, "collectible through" Bladenboro. Williamson was au-

thorized to sign the name of Jerry Richardson, the principal officer of RUCI, on the draft. The second part was for record purposes and the third part was an envelope, in which Williamson would place the titles to the cars being financed, to be mailed directly to Bladenboro.

When Car Retailers purchased a used car, it would give the seller a draft on its CB&T account. The seller would then forward the draft and the titles for the cars for which the draft was given in payment to CB&T. After May 1973, Car Retailers' account with CB&T was in an overdraft position, so that when a draft on Car Retailers was presented CB&T would notify Car Retailers which would then make a deposit to its account to meet the draft. Included in these deposits would be the drafts drawn on RUCI. CB&T would "sight post" the deposits and issue CB&T treasurer's checks in payment of the sellers' drafts, delivering the titles to Car Retailers. Thus CB&T paid out its funds against the uncollected drafts on RUCI.

When CB&T received a draft on RUCI as part of a Car Retailers deposit, it would send the item to Riggs National Bank of Washington, D.C. since CB&T was not a member of the Federal Reserve System. Riggs National would forward the item to Wachovia, which would forward it to Charlotte Federal Reserve, which would forward it to Richmond Federal Reserve, which would send it to Bladenboro.

Effective January 1, 1974, RUCI (Richardson), at the instance of Bladenboro which concluded that the financing arrangement was getting out of hand, claims that it notified Car Retailers (Williamson) that his authority to draw drafts on RUCI was revoked although RUCI would honor

---

1. Bank of Bladenboro, Bladenboro, North Carolina (Bladenboro); The Federal Reserve Bank of Richmond, Virginia (Richmond Federal Reserve); The Federal Reserve Bank of Richmond, Virginia, Charlotte, North Carolina Branch (Charlotte Federal Reserve); and Wachovia Bank and Trust Company, N.A., Charlotte, North Carolina (Wachovia). Richmond Federal Reserve filed a third-party complaint against Charles I. Bridger and Jerry Richardson, alleging that they revoked the authority of the agent to execute drafts but failed to notify CB&T of the revocation so that they are liable to Richmond Federal Reserve for claims asserted against Richmond Federal Reserve.

drafts drawn up to that date.[2] Notice of any revocation of authority was not given to CB&T and Car Retailers (Williamson) did not observe any revocation. After January 1, 1974, Car Retailers (Williamson) continued to execute drafts on RUCI and it continued to deposit them to its account with CB&T and CB&T continued to pay against them. When drafts executed after January 1 reached Bladenboro, they were dishonored. For some unexplained reason,[3] CB&T was not advised that these drafts were dishonored until the middle of January. By that time it had paid or committed for payment $347,163 for dishonored RUCI drafts. Unfortunately, when RUCI dishonored drafts drawn after January 1, 1974, Bladenboro sent most of the accompanying automobile titles to Car Retailers rather than to CB&T. As a consequence, CB&T was able to salvage only approximately $40,000 of its loss.

We have stated that, subsequent to May 1973, Car Retailers' account with CB&T was in an overdrawn condition. The fact is that, as early as June 1973, CB&T's head bookkeeper became concerned about the account because of its use of uncollected funds. In the late summer of that year, he expressed his concern to the branch manager of the branch where Car Retailers' account was maintained. The branch manager began to monitor the account, and then the account was moved to CB&T's head office in October 1973. In that same month, the head bookkeeper called the account to the attention of CB&T's executive vice president because of the size of the account and Car Retailers' use of uncollected funds. By November 1973, CB&T's senior loan officer was also concerned about the overdrafts. At that time, CB&T placed

a ten-day "hold" on Car Retailers' deposits, the purpose of which was to restrict Car Retailers' use of its deposits for ten days, the period that CB&T thought would be required to determine that they were paid and not returned to CB&T. But the "hold" was *never* observed and CB&T continued to pay against uncollected drafts until it received actual notice of the dishonor of the RUCI drafts.

## II.

■ We approach our decision with full recognition that issues of negligence and contributory negligence are ordinarily not susceptible of summary adjudication. Nonetheless, Rule 56, F.R.Civ.P., applies to negligence actions, and if the requirements of the rule are met, i. e. that the material facts are not in dispute and one of the parties is entitled to judgment as a matter of law, summary judgment should be granted. *Bland v. Norfolk & Southern Railroad Company,* 406 F.2d 863 (4 Cir. 1969); *Allen v. New York Central Railroad,* 397 F.2d 257 (6 Cir. 1968); *Stevens v. Howard D. Johnson Company,* 181 F.2d 390 (4 Cir. 1950). We also keep fully in mind that this case was before the district court under its diversity jurisdiction and we must look to the law of North Carolina in deciding it. Fortunately our task in this regard is made easier by the fact that North Carolina has adopted the Bank Deposits and Collections provisions of the Uniform Commercial Code. *See* N.C.Gen.Stat. § 25–4–101 *et seq.*

■ As we view this record, we think that, under the facts here, CB&T was guilty of contributory negligence as a matter of law, thereby barring it from any recovery

---

**2.** Car Retailers (Williamson) disputes this fact. Williamson claims that he was never advised that his authority was revoked. Of course, CB&T recovered from F&D in the previous case on the theory that there had been an effective revocation of Williamson's authority. Even if CB&T and its subrogee F&D are not collaterally estopped to assert to the contrary in this case, the factual dispute is unimportant for our purposes. The facts are that the drafts drawn after January 1, 1974 were dishonored

when presented and that CB&T had paid them when they were deposited.

**3.** The district court purported to find where there was fault contributing to the lateness of the notice to CB&T among the various banks playing a part in the collection process. In view of our conclusion that CB&T is barred from recovery because of its contributory negligence, we do not consider these aspects of the case.

from defendants.[4] Our conclusion stems from the fact that CB&T, ignoring its own hold order and disregarding its actual knowledge of the long-standing overdrawn condition of Car Retailers' account, routinely and continually paid against uncollected funds.[5]

Of course, we do not hold that every bank which pays against uncollected funds is thereby guilty of contributory negligence. North Carolina law prescribes the standard of "ordinary care" in the conduct of the banking business, § 25–4–103; and North Carolina law appears to contemplate that, in the exercise of ordinary care, a bank may conclude to pay against an uncollected item, because it gives a bank a security interest in an item against which it has made an advance. *See* § 25–4–208(1)(a) and Comment (1). Indeed, CB&T has filed an affidavit in which a bank official asserts that it was generally accepted banking custom, usage and procedure to sight-post deposits to a customer's account and to pay items drawn on a customer's account against uncollected funds.

But this is not the ordinary case. As a result of its awareness for a period of seven months (May to November 1973) that Car Retailers' account was consistently overdrawn, CB&T established a ten-day hold, the purpose of which was to prevent payment against deposited items until they had been collected. In our view, CB&T, the bank having the greatest knowledge of the status of Car Retailers' continuing account, determined that, in the exercise of ordinary care, CB&T should no longer pay funds against Car Retailers' account until the items deposited therein were paid.[6] Having set that standard, CB&T flagrantly violated it. It did not approve payment of only a single or only a few charges against CB&T's account for special reasons or under exceptional circumstances. It paid, as a matter of course, *every* item presented after the effective date of the hold against uncollected funds until it received actual notice of the first dishonor of the RUCI drafts. During the first seventeen days of January 1974, alone (prior to the date of actual notice of dishonor), CB&T sight-posted twenty-nine of Car Retailers' deposits having a value of $236,065, and issued thirty-three of its treasurer's checks in payment of drafts in the amount of $263,896.

The parties have not cited, nor have we found, any North Carolina decisions holding that payment against uncollected funds may be a negligent act. Nor is there any North Carolina decision to the contrary. In *Wilhelm Foods, Inc. v. National Bank of No. America*, 388 F.Supp. 1376 (S.D.N.Y. 1974), it was held that even if a bank failed to use ordinary care in failing to return sight drafts, a shipper who had shipped goods before the drafts were presented to the bank and who at the time of shipment

---

**4.** We reject the argument that Wachovia has waived the defense of contributory negligence for failure to plead it. In its amended answer, Wachovia responded to CB&T's assertion that defendants' negligence caused its loss by alleging "this answering defendant says . . . if, in fact, any damage whatsoever occurred, that it was through [CB&T's] own negligence and deficiency in clearing checks upon uncollected funds." Although not with the precision that CB&T might have desired, we think the allegation sufficiently complies with Rule 8(c), F.R.Civ.P., so that it cannot be said that the defense was waived.

**5.** In finding CB&T contributorily negligent, the district court assigned six bases for its conclusion: (1) CB&T did not honor its hold, (2) CB&T never ascertained the duration or extent of the authority of Williamson to draw drafts on behalf of RUCI, (3) CB&T should have

known that the dishonored drafts were signed by Williamson and not Richardson, (4) payment of the drafts was authorized by an officer of CB&T who was ignorant with respect to bank collection practices, (5) CB&T paid the drafts before they were collected, and (6) CB&T never took effective steps to curtail the overdrawn condition of Car Retailers' account. While we reach the same conclusion, we place our reliance principally on the first and fifth factors identified by the district court.

**6.** In the deposition of the executive vice president of CB&T, that bank official agreed that since November 1973, CB&T had had "warning signals" and realized that "[a]s to uncollected funds . . . it was kind of a house of cards, and it could all come tumbling down." He also agreed that that is precisely what happened.

knew that its customer had not paid earlier drafts could not recover since the shipper would be contributorily negligent in extending credit under the circumstances. *Id.* at 1382–83. We think that this is a similar case.

CB&T argues, however, that if one or more of the banks in the chain of collection was negligent in transmitting notice of dishonor of the drafts, CB&T should, despite negligence on its part, be permitted to recover for funds which it advanced on uncollected drafts after the date on which the first notice of dishonor should have reached it. We are not persuaded by this argument. CB&T's losses were proximately caused by its own negligence in advancing funds against uncollected drafts and in ignoring its own hold on those drafts. Its argument that a speedier notification by the defendant banks of the drafts' dishonor would have enabled it to act sooner in mitigating the losses caused by its own negligence invokes in effect the doctrine of last clear chance. But an essential premise for application of that doctrine is not shown in this record, namely that any defendant was aware that CB&T was advancing funds against uncollected drafts and with such knowledge failed to rescue CB&T from the peril in which it had placed itself. *See* W. Prosser, Law of Torts (1971) § 66, pp. 427, 429–31. We thus conclude that CB&T must bear the full brunt of its contributory negligence.

The judgment of the district court is *AFFIRMED.*