DOUGLASTON ELECTRIC SALES, INC., Appellant, v ROYAL BANK OF CANADA, Respondent.

Second Department, July 30, 1979

APPEARANCES OF COUNSEL

*Hirshfeld, Birbrower, Montalbano, Condon & Seidenberg, P. C. (Harold A. Seidenberg* of counsel), for appellant.

*Sage Gray Todd & Sims (Steven J. Glusband* of counsel; *Robert W. Brundige, Jr.,* on the brief), for respondent.

## OPINION OF THE COURT

MARGETT, J.

In the summer of 1977, three shipments of electrical equipment arrived at the pier in Santo Domingo. Although the goods were fully paid for by the vendee in Dominican pesos, the Santo Domingo branch of the collecting bank was never able to obtain foreign exchange in United States dollars for the full amount of the proceeds. The issue at bar is whether summary judgment was properly granted to the collecting bank in an action against it by the vendor of the goods.

Since at least June, 1975, plaintiff has been exporting electrical equipment to the Dominican Republic. Many of its sales have been to a government-owned utility, Corporacion Dominicana del Electricidad (hereinafter CDE). A Dominican firm, Servindo, S. A., has acted as plaintiff's business agent in that country on a number of occasions. Defendant, the Royal Bank of Canada, has collected payments on more than 30 of plaintiff's shipments through its Santo Domingo office.

Collections were made on sight drafts drawn by plaintiff on its purchasers in the Dominican Republic. It is alleged by defendant that "[d]uring its entire business relationship with Royal Bank [plaintiff] has been on notice that the laws of the Dominican Republic prohibited local consumers from paying for imported merchandise with U.S. currency." Collections were consistently made in Dominican pesos, and each time a collection was made, plaintiff was advised by defendant's New York branch office that the draft has been "PAID IN LOCAL CURRENCY". A number of these notifications contained the stamped legend: "AWAITING AUTHORIZATION FROM THE CENTRAL BANK TO REMIT IN U.S. DOLLARS." Accompanying all the notifications was a Royal Bank form which included the following:

"IMPORTANT ADVICE

"According to a communication of the Monetary Board dated September 2, 1964, the proceeds of your collection have been deposited with the Central Bank of the Dominican

Republic pending provision of the foreign exchange required to complete the remittance to you. Standing regulations relating to obtaining final settlements have been complied with.

"In order to give you an idea of the delay that may take place, we would mention that the last remittances effected by us were for collections paid in local currency on _____.

"Our lawyers are of the opinion that based on the Monetary Law the drawee by paying the face value of the draft in local currency, discharges his obligations and the Central Bank is responsible for supplying the commercial banks with the foreign exchange. It is held that any differential in the exchange will be for account of the Central Bank. In any case, this Bank can accept no responsibility for any procedural delays in delivery of the required foreign exchange or for any consequences thereof."

For its part, plaintiff would customarily provide a letter containing the number of the appropriate sight draft for each transaction, addressed "TO WHOM IT MAY CONCERN". The letters recited that "Douglaston Electric Sales, Inc. does not have an agent or representative in the Dominican Republic." They concluded: "We are therefore acting strictly on our own behalf in this transaction, and ask you to kindly process the above-referenced draft."

The purpose of these letters was apparently to avoid the deduction of a local agent's commission by the Central Bank. Such a deduction, required by law,[1] is taken from amounts collected by commercial banks and awaiting authorization by the Central Bank for foreign exchange. Where the foreign supplier does not have an agent or representative in the Dominican Republic, it is obliged to submit a certification to that effect. Prior to the instant controversy, defendant was always able to get foreign exchange for the full amount of its collections and remit United States dollars to plaintiff within 30 days of delivery of a shipment of goods.

In the transaction at bar, defendant's Santo Domingo branch collected in pesos on three separate sight drafts. One draft, for $58,128.76, covered a September 21, 1976 purchase order from CDE for transformers and various electrical appa-

---

1. There is no doubt that the deduction was required as of July 14, 1977, the date of a resolution to that effect by the Monetary Board of the Dominican Republic. It would appear that such a regulation was in effect even prior to that date since an affidavit of Donald Bermack, one of plaintiff's officers, alleges that its "no local agent" letter was employed in each transaction it undertook in the Dominican Republic.

ratus. The second, for $35,797.43, covered an October 12, 1976 purchase order by the same company for steel stranded wire. The third, for $16,783.35, covered a February 4, 1977 purchase order by CDE for copper wire and amplifiers. The three drafts totaled $110,709.54.

Although plaintiff furnished Royal Bank in each instance with the form letters disclaiming the presence of any agent in the Dominican Republic, the documents in the record indicate that Servindo, S. A. acted as its representative with respect to all three orders. The two 1976 purchase orders heretofore alluded to are both addressed to plaintiff "c/o Servindo, S.A. (Ing. Delfos Caro)". The September 21, 1976 purchase order has a reference to plaintiff's "Quotation No. D8-76 dated August 13, 1976, signed by Ing. Delfos Caro." The October 12, 1976 purchase order refers to plaintiff's "Quotation No. D12-76 dated Sept. 20, 1976 signed by Ing. Delfos Caro R."

The February 4, 1977 purchase order is addressed to plaintiff "C/o. Servindo, S.A.", and contains a reference to a February 2, 1977 quotation signed by Delfos Caro. It appears that Delfos and Ramon Caro, who are obviously principals in Servindo, S. A., had a great deal to do with securing this third order for more than $16,000. The purchase order number is 2653-028-77. A letter dated February 15, 1977, from Ramon A. Caro of Servindo, S. A., to "Mr. Don Bermack" of Douglaston Electric Sales, reads as follows:

"Dear Don:

"Enclosed please find C.D.E. order 2653-28-77 for total US $16,244.66 which substitute previous order No. 2653-416-76, for total US $9,907.26.

"This was the result of our request to increase price of order due to the mistyped errors.

"In order to have this accomplished we had to pay to C.D.E. official the amount of US $2,440.00 as stated in attached check.

"We have calculated for this order a gross profit of US $3,623.00, obtained as following.

| | | |
|---|---|---|
| A. - Total value order No. 028-77 | US | $16,244.66 |
| B. - Less payment to C.D.E. official to approve increase (copy of check No. 016 attached) | " | 2,440.00 |
| C. - Net value of the order | " | 13,804.66 |

D. - Less gross cost of material and
handling, including freight        "     10,181.00

E. - Gross profit                         3,623.00

"Item (E) will be divided 50% for Douglaston, 50% for Servindo. Douglaston to send the share of profit (E) plus item (B). This make up a total of.

| | | |
|---|---|---|
| (B) | US | $2,440.00 |
| 50% of (E) | " | 1,811.00 |
| Total Remittance | US | $4,251.00 |

"Do not keep the total remittance once you receive payment of draft.

"In addition, we want a letter in which you commit your company to send the Servindo's share of profits, no later than two weeks after date of receipt of payment in this and all future orders.

"Let's do business like it should be done between the companies that are considered allied in the struggle for Survivor.

           "Regards,

           "SERVINDO, S.A.

           "Ramon A. Caro" (emphasis supplied).

A reply from Mr. Bermack on plaintiff's stationery, dated February 24, 1977, expresses plaintiff's concern for the "error in transmitting two prices * * * by teletype" and asks the recipient—Delfos Caro—to express plaintiff's "apologies to our friends at C.D.E. and our desire to continue our relationship."

Servindo's continuing link to plaintiff and the three orders in question (numbers 2653-313-76, 2653-323-76 and 2653-028-77) is borne out by an August 9, 1977 cable from D. Caro to D. Bermack, confirming that the drafts accompanying the shipments had been paid by CDE:

"AUG. 9/77

"ATTN. D. BERMACK

"GOOD NEWS RECEIVED NOTICE FROM ROYAL BANK SANTO DOMINGO THE FOLLOWING BC'S WERE PAID BY CDE. PENDING ONLY TRANSFER FROM CENTRAL BANK TO YOUR COMMERCIAL BANK AFTER APPROVAL:

| "CDE ORDER NO. | BC NO. | AMOUNT |
|---|---|---|
| 2653-313-76 | 13818 | 57,926.00 |
| 2653-323-76 | 10462 | 33,975.00 |

"WE HAD TO USED HIGH LEVEL OFFICIAL INTERVENTION FOR DOLLARS 1,500.00 AT OUR COST BUT IMPORTANT THING WAS TO COLLECT AND IT WORKED.

"CDE PAID ORDER NO. 2653-28-77 TO THE ROYAL BANK FOR DOLLARS 16,244.66 PENDING FOR SHIPMENT.

"OUR OPINION PLEASE SHIP SINCE ONLY PART OF TRANSACTION PENDING IS APPROVAL OF BC NO. 15799 BY CENTRAL BANK AND REMITTANCE TO YOUR BANK.

"PLEASE ACKNOWLEDGE.

"REGARDS

"D. CARO" (EMPHASIS SUPPLIED).

The sight drafts themselves provided that the Royal Bank of Canada collect the appropriate amounts from CDE in "United States Dollars". The latter instruction was a preprinted one on the form of the draft. It was contradicted, in each instance, by typed payment instructions stating: "All collection charges *including exchange charges* if any for account of drawee" (emphasis supplied).

The collections alluded to in the cable from Caro to Bermack were made in Dominican pesos on August 9 or 10, 1977. Documentation in the record establishes that defendant made application to the Central Bank, on August 10, 1977, for the foreign exchange in United States dollars necessary to complete the transaction.

This time, Central Bank approval was not immediately forthcoming. By cable dated October 25, 1977, defendant's Santo Domingo branch advised its New York office that two named gentlemen in the Central Bank "confirmed that * * * authorization from the President's office must be furnished before they approve foreign exchange application". The cable further stated that the branch had communicated with a CDE official "who informed that they are endeavoring to obtain this document". Plaintiff was immediately informed of these developments.

It is alleged by the manager of defendant's Santo Domingo branch that subsequent thereto, representatives of the Central Bank informed his office that another cause of their denial of the application was that they had been informed by CDE that a local agent, Servindo, S. A., had handled the sales on behalf of plaintiff and was owed commissions in connection therewith. Dominican law, previously alluded to, required that commissions earned by local agents be deducted by the Central Bank from the total amounts sought to be converted into foreign currency by collecting banks. A July 14, 1977 resolution of the Monetary Board of the Dominican Republic (the agency empowered by law with the responsibility of regulating

all foreign exchange transactions) cautioned that in connection with the said deductions, "[t]he Foreign Exchange Dept. of the Banco Central is authorized to watch for the true execution of this resolution and should not authorize the sale of foreign exchange in case these regulations may not be fulfilled."

In December, 1977 three letters—each alluding to one of the three purchase orders involved in this case—were furnished to the Central Bank. All were on plaintiff's stationery; all purported to be signed by "D.B. Bermack, President"; and all were addressed to the Banco Central of the Dominican Republic. Each recited the amount of the appropriate purchase order and then listed a portion thereof as a commission due to Servindo, S. A. "as intermediaries in the transaction." The letters then recite: "We are aware that the amount due to the local company that intervenes in the Dominican Republic, has to be paid in local currency, therefore, we are reporting what is due to them to comply with local regulations and expedite payment to us." The "commissions" stated in the letters total slightly more than $20,000.

Defendant's Santo Domingo branch manager alleges, "[u]pon information and belief," that the letters were presented to the Central Bank by Servindo. He further states that Servindo advised his office that it was instructed by the Central Bank to deliver the letters thereto. The Central Bank then verbally instructed his branch to deduct the commissions stated in the letters and then to resubmit the applications for foreign exchange to the Central Bank.

The resubmissions were made and, on December 30, 1977, foreign exchange of some $90,000 (United States) was approved by the Central Bank. On January 4, 1978 defendant paid Servindo the equivalent of some $20,000 (United States) in Dominican pesos. On January 6, 1978 a check for the $90,000 which had been released from the Dominican Republic was presented by defendant to the Marine Midland Bank in New York for credit to plaintiff's account.

On January 19, 1978, defendant's New York office received a telex from Mr. Bermack, stating that plaintiff did not authorize any deductions for the payment of commissions to Servindo. Bermack subsequently advised defendant's collection department in New York that the three letters which had authorized payments to Servindo were forgeries.

The instant action, alleging that defendant has wrongfully

paid nearly $20,000 of plaintiff's money to Servindo, was commenced on or about February 15, 1978. By letter dated the same day, defendant forwarded copies of the alleged forged letters to Marine Midland Bank's signature control department, and requested "verifications" of the signatures thereon. In a February 23, 1978 letter, Marine Midland's response was that the signatures did not verify with the signature in their files.

It is alleged by defendant that at this juncture, its Santo Domingo branch managed to recover the Dominican pesos equivalent to some $20,000 from Servindo. The Santo Domingo branch manager alleges that the funds were recovered on March 7, 1978, and that an application to exchange those pesos into United States dollars was submitted to the Central Bank that day.

Within 48 hours, however, on March 9, 1978, defendant's Santo Domingo branch was served with an embargo and order issued by the Presiding Judge of the Civil & Commercial Court of the Second Circuit of the Court of the First Instance of the National District in Santo Domingo. This "attachment" prohibited the transfer of the $20,000 held for plaintiff's account, pending the court's determination of an action filed by Servindo against plaintiff for these funds which Servindo claimed were owed to it by plaintiff. It appears that plaintiff failed to appear in that action and, on November 6, 1978, defendant's Santo Domingo branch paid the funds in question to Servindo pursuant to a judgment of the said Civil & Commercial Court.

Meanwhile, defendant herein had moved to dismiss the instant complaint on the grounds (a) that it fails to state a cause of action, (b) that the court should not proceed in the absence of Servindo, S. A., and the Central Bank of the Dominican Republic, and (c) of *forum non conveniens.* Plaintiff cross-moved for summary judgment.

In an opinion dated June 5, 1978 (some five months prior to the time that judgment was entered in Servindo's favor in the Dominican Republic), Special Term "award[ed] the defendant summary judgment" pursuant to CPLR 3211 (subd [c]). The court relied on section 204-a (subd 3, par [a]) of the Banking Law, which provides that any foreign banking corporation doing business in New York shall be liable for contracts to be performed in foreign countries to no greater extent than a

bank organized and existing under the laws of such foreign country would be liable under its laws. The court found that "[n]o evidence has been presented * * * that the defendant's actions were violative of the law and regulations of the Dominican Republic." Indeed, the defendant was "not withholding payment by its own volition but [was] honoring the order of the foreign Court."

As for the fact that the sight drafts called for payment in United States dollars, Special Term found it "significant" that such instruction "is merely a printed wording on the sight draft." The court concluded that "[a]bsent a showing by the plaintiff that there was to be a change in the conduct of the affairs between the parties, the defendant had every right to continue collecting the sight drafts in pesos."

The resulting judgment, entered July 13, 1978, is appealed by plaintiff. It is contended that the Uniform Commercial Code applies to this case by virtue of the fact that "the transactions between ROYAL BANK and DOUGLASTON occured [sic] in New York and the center of gravity of the collecting agreement was New York also". It is argued that under the Uniform Commercial Code, defendant is liable as a "payor bank" and, alternatively, as a "collecting bank" for accepting payment on the sight draft in Dominican pesos.

Plaintiff also claims that defendant was negligent in failing to promptly secure foreign exchange for the full amount collected. It is said that defendant "negligently failed to submit or to arrange to submit with its application the letter of Presidential approval." Furthermore, plaintiff contends (somewhat illogically) that "[h]ad ROYAL BANK properly inquired as to the existence of an agency when the original documents clearly reflected none, appellant would have received its full monies." Finally, it is said that defendant's conduct in actually paying Servindo establishes a basis for liability which should properly be the subject of a plenary trial.

We disagree with the contentions advanced by plaintiff and affirm the judgment appealed from. Assuming, *arguendo,* that New York law is controlling in this case, both the Banking Law (§ 204-a, subd 3, par [a]) and the Uniform Commercial Code (§ 4-102, subd [2]) absolve defendant of any liability, at least insofar as the complaint alleges that defendant has

wrongfully withheld money belonging to plaintiff.[2] The latter section provides that "[t]he liability of a bank for action or non-action with respect to any item handled by it for purposes of presentment, payment or collection is governed by the law of the place where the bank is located." Certainly, it is beyond dispute that as of March 9, 1978, the funds in question were attached pursuant to an order of a court of the Dominican Republic. Defendant's ability to remit the funds has unquestionably been restricted by Dominican law since that date.

It further appears that at all relevant times prior to that date, defendant was unable to remit the entire amount of its collection solely because the Central Bank would not authorize foreign exchange, in the form of United States dollars, for the full amount. An affidavit sworn to by Ramon Caceres Troncoso, an attorney duly admitted to practice in the Dominican Republic, states that "[t]he foreign exchange law, requires that a banking institution, such as Royal Bank, request approval from the Central Bank for foreign exchange in order that local funds can be exchanged for foreign currency and be remitted abroad to pay for imported items."

Although defendant has alleged that "the laws of the Dominican Republic prohibited local consumers from paying for imported merchandise with U.S. currency", Special Term correctly noted that the affidavit of Sr. Troncoso "does not indicate whether the defendant was required under the Laws of the Dominican Republic to collect sight drafts in one currency or the other." Evidence of such a prohibition against paying for imported merchandise with United States currency would, on the basis of section 204-a (subd 3, par [a]) of the Banking Law and subdivision (2) of section 4-102 of the Uniform Commercial Code have obviated the need for further inquiry since it then would have been clear that defendant did all it could in plaintiff's behalf, within the framework of the laws of the Dominican Republic. Absent such evidence, we turn to the "agreement" of the parties and consider whether there are triable issues with respect to defendant's failure to collect initially in United States currency.

At the outset we note that there is no merit to plaintiff's claim that defendant acted as a "payor bank" and that, as such, its acceptance of Dominican pesos, without dishonoring

2. This is, in essence, all that the complaint alleges. Since summary judgment was granted to defendant, however, we will construe the complaint very broadly and read into it causes of action sounding in breach of contract and negligence.

the draft or asking for Douglaston's approval, makes it liable for the entire draft (cf. Uniform Commercial Code, § 4-302; *Met Frozen Food Corp. v National Bank of North Amer.,* 89 Misc 2d 1033). Subdivision (b) of section 4-105 of the Uniform Commercial Code defines "[p]ayor bank" as "a bank *by which* an item is payable" (emphasis supplied). A drawee bank would be a "payor bank" as would "a bank at which an item is payable *if the item constitutes an order on the bank to pay,* for it is then 'payable by' the bank" (Official Comment No. 2, McKinney's Cons Laws of NY, Book 62½, Uniform Commercial Code, § 4-105, p 530; emphasis supplied). By comparison, where an item is "payable through" a particular bank, such bank will be a collecting bank; it is not a "payor bank" (Official Comment No. 3, McKinney's Cons Laws of NY, Book 62½, Uniform Commercial Code, § 4-105, p 530).

At bar, the sight drafts were drawn on CDE and were to be paid by CDE "to the Order of ROYAL BANK OF CANADA". Typed on each of the drafts, in one form or another, is the instruction: "Collect thru: Royal Bank of Canada, Santo Domingo, Dominican Republic." Quite clearly the drafts are not orders on the bank to pay; rather, they contemplate that the funds will be payable through the bank. Thus, defendant's status must be termed that of a collecting bank (see Official Comment No. 3, McKinney's Cons Laws of NY, Book 62½, Uniform Commercial Code, § 4-105, p 530; see, also, *Hydrocarbon Processing Corp. v Chemical Bank N. Y. Trust Co.,* 16 NY2d 147).

A collecting bank owes its principal "ordinary care" in the discharge of its duty (Uniform Commercial Code, § 4-202; *Hydrocarbon Processing Corp. v Chemical Bank N. Y. Trust Co., supra).* "[T]he parties may by agreement determine the standards by which [the bank's] responsibility [to exercise ordinary care] is to be measured if such standards are not manifestly unreasonable" (Uniform Commercial Code, § 4-103, subd [1]). The "agreement" of the parties is their "bargain * * * in fact as found in their language or by implication from other circumstances including course of dealing" (Uniform Commercial Code, § 1-201, subd [3]). A "course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct" (Uniform Commercial Code, § 1-205, subd [1]). Wherever reasonable, the express terms of

an agreement and the parties' course of dealing should be construed as consistent with each other (Uniform Commercial Code, § 1-205, subd [4]), and such course of dealing "give[s] particular meaning to and supplement[s] or qualif[ies] terms of an agreement" (Uniform Commercial Code, § 1-205, subd [3]).

At bar, the express terms of the parties' agreement, as reflected in the sight drafts and accompanying shipping instructions, are rather ambiguous. The instruction to collect in "United States Dollars" is, as Special Term aptly put it, "merely a printed wording on the sight draft." Additional *typed* payment instructions contradict the printing on the sight drafts in each instance by providing that "[a]ll collection charges *including exchange charges* if any [are] for account of drawee" (emphasis supplied).

The apparent discrepancy between these two written provisions is readily explained by the previous sequence of conduct between these two parties, as disclosed by the mass of documentary evidence adduced by defendant. Collections were consistently made in Dominican pesos which were then exchanged for United States dollars after Central Bank approval had been obtained. The dollars were then remitted to plaintiff.

The record contains copies of no less than six notices from defendant to plaintiff, covering previous transactions spanning the period August 25, 1975 through January 10, 1977. All bear the stamped notation, "PAID IN LOCAL CURRENCY, AWAITING AUTHORIZATION FROM THE CENTRAL BANK TO REMIT IN U.S. DOLLARS." Richard S. Ruh, a senior clerk in defendant's collections department in New York, has averred that such notations appeared on at least 31 collection notices given plaintiff since June, 1975. It is undisputed that each of these collection notices was accompanied by a Royal Bank form which advised, *inter alia,* that the bank's counsel was of the opinion that a drawee could, under the Monetary Law of the Dominican Republic, discharge his obligations by paying the face value of a draft in local currency.[3]

"Legends on deposit tickets, collection letters and acknowledgements of items, coupled with action by the affected party constituting acceptance, adoption, ratification, estoppel or the

---

3. There is no contrary evidence in the record and plaintiff admits, in its brief, that collection was made in pesos on "various transactions [which] occurred in the past". Plaintiff does not dispute that collections were regularly made in pesos, but claims simply that it "never consented to payment in a manner other than that specified on the drafts."

like, are agreements" as long as they otherwise qualify under the Uniform Commercial Code's definition of "agreements" (Official Comment No. 2, McKinney's Cons Laws of NY, Book 62½, Uniform Commercial Code, § 4-103, p 520). In light of these documents, reflecting the prior conduct of the parties, that portion of the sight draft which refers to "United States Dollars" should be construed to mean only that the ultimate remittance was to be in dollars. Accordingly, we hold that defendant neither breached its agreement with plaintiff, nor failed to exercise ordinary care (see Uniform Commercial Code, § 4-202) by collecting the subject drafts in Dominican pesos.

Plaintiff's remaining points verge on the frivolous. In essence, plaintiff contends that *had* defendant gotten the approval of the President of the Dominican Republic, it could have gotten foreign exchange approval for the full amount of the funds. The money then could have been remitted abroad before the processes of Dominican law—which mandated deduction in pesos of amounts owed to local agents such as Servindo—came to bear on the situation.

Aside from the fact that defendant cannot be held liable for not circumventing Dominican law expeditiously enough, it is sheer speculation that the President's office would have given the necessary approval. Indeed, it would appear that the initial complaint to the Central Bank came not from Servindo, but rather from someone in the government.[4] Coupling this with the fact that a July 14, 1977 resolution of the Monetary Board had admonished the Central Bank to "watch for the true execution" of the law with respect to deduction, in pesos, of local agents' commissions, it would appear that the government was attempting to rigorously enforce the foreign exchange laws of the country. Under these circumstances, it is not only speculative, but unlikely as well, that defendant could have secured the approval of the executive branch of the government.

Nor can defendant's payment to Servindo, without plaintiff's

4. The manager of defendant's Santo Domingo branch averred that representatives of the Central Bank had told his office that someone in CDE had reported that Servindo acted as agent. It is not unlikely that it was CDE, a State owned utility, and not Servindo which was making the complaint, in light of Ramon A. Caro's February 15, 1977 letter to Bermack, in which a *direct* remittance of commissions and "expenses," payable in United States dollars, was contemplated. It seems that Servindo had been perfectly happy to circumvent the foreign exchange laws of its own country.

authorization, establish a basis for liability. It is uncontra-dicted that defendant recovered those funds and was endeavoring to obtain foreign exchange for them when served with the embargo and order attaching the said funds. Thus, defendant's initial payment to Servindo, even if wrongful, is not the cause of any loss sustained by plaintiff.

There being no valid, triable issues of fact, summary judgment was properly granted in favor of defendant.

HOPKINS, J. P., TITONE and MANGANO, JJ., concur.

Judgment of the Supreme Court, Rockland County, entered July 13, 1978, affirmed. Appeal from an order of the same court, entered July 25, 1978, dismissed. No appeal lies from an order denying a motion to reargue a decision.

Defendant is awarded one bill of $50 costs and disbursements.