931 F.2d 887
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
LLOYD'S EXCELLENT AUTOMOBILES, INCORPORATED, d/b/a Don L.
Motors, Plaintiff-Appellee,
v.
SOUTH CAROLINA NATIONAL BANK, Defendant-Appellant,
and
Jefferson National Bank at Sunny Isles, Defendant.
LLOYD'S EXCELLENT AUTOMOBILES, INCORPORATED, d/b/a Don L.
Motors, Plaintiff-Appellant,
v.
SOUTH CAROLINA NATIONAL BANK, Defendant-Appellee,
and
Jefferson National Bank at Sunny Isles, Defendant.
 Nos. 90-1760, 90-1767.
 United States Court of Appeals, Fourth Circuit.
 Argued Jan. 7, 1991.
Decided April 30, 1991.
 
 Appeals from the United States District Court for the District of South Carolina, at Columbia. Matthew J. Perry, Jr., District Judge. (CA-88-525-3-0)
 L. Henry McKellar, Law Department, South Carolina National Bank, Columbia, S.C. (Argued), for appellant; Stan McGuffin, Catherine Doscher Byrd, Law Department, South Carolina National Bank, Columbia, S.C., on brief.
 Martin Baron Stanton, Tompkins & McMaster, Columbia, S.C., for appellee.
 D.S.C.
 AFFIRMED IN PART AND REVERSED IN PART.
 Before ERVIN, Chief Judge, BUTZNER, Senior Circuit Judge, and JOSEPH H. YOUNG, Senior United States District Judge for the District of Maryland, sitting by designation.
 PER CURIAM:
 
 
 1
 On March 2, 1988, Lloyd's Excellent Automobiles, Inc. ("Lloyd's") filed this action against South Carolina National Bank ("SCN") to recover the face amount of documentary drafts (automobile envelope drafts) held beyond the period allowed for payment or return under South Carolina Code of Laws Secs. 36-3-419 and 36-4-302 and on a theory of negligence. On October 6, 1989, a jury returned a verdict in favor of Lloyd's in the amount of $15,100, the face amount of 24 drafts, in actual damages and awarded Lloyd's $34,900 in consequential damages. Lloyd's motion for judgment notwithstanding the verdict for $219,600, which represented the face amounts of all the drafts, plus consequential damages, and costs and attorney's fees and SCN's motion to reduce the verdict were denied.
 
 
 2
 SCN contests the award of actual damages since Lloyd's demanded return of the drafts and the accompanying titles, constituting an extra-judicial election of remedies. SCN also challenges the award of consequential damages. First, it argues that consequential damages are not allowed against payor banks. Alternatively, if consequential damages are allowed, SCN contends that the evidence was insufficient for the jury to find bad faith as required under the state statute. Lloyd's counter-appeal argues that the trial court erred in denying its motion for sanctions and in instructing the jury that if it found that Lloyd's mitigated its damages, the amount mitigated could be subtracted from the statutorily prescribed recovery for the face amount of the drafts.
 
 
 3
 * Don Lloyd owns Lloyd's and Don L. Motors in Miami, Florida. The largest portion of his business includes buying used vehicles from car dealers and selling them to other car dealers.
 
 
 4
 Lloyd's used envelope drafts to purchase these cars for resale and accepted them as payment when the cars were resold to other dealers. Envelope drafts are envelopes with a draft printed on the outside of the envelope. The envelopes have the buyer's bank's name and address and vehicle identification information on them, and are given to the seller of the automobile when the buyer takes possession. The seller then places the title to the vehicle in the envelope and deposits the draft in his bank for forwarding to the buyer's bank. The seller may be given immediate credit upon deposit of the draft.
 
 
 5
 When the buyer's bank receives the envelope draft, it contacts its customer and notifies him that the draft has arrived and should be picked up. The buyer must pay for the draft before the title is released, either by giving the bank funds or by authorizing the bank to debit his account.
 
 
 6
 Leon Campbell owns Campbell's Cleanup ("Campbell's") in Darlington, South Carolina. Campbell's buys used cars from dealers like Lloyd's and cleans and refurbishes them for resale at Clanton's Auto Auction ("Clanton's") in Darlington.
 
 
 7
 Campbell's had an ongoing relationship with Lloyd's since 1986, dealing for the most part with Mike Drotch. Typically, Drotch would call Campbell's by phone and offer to sell a car. Once the price was agreed upon, Drotch would fill out an envelope draft previously signed by Campbell's. Delivery to Campbell's in Darlington occurred when 8 cars were sold.
 
 
 8
 Once the cars were shipped to Campbell's, the titles would be placed in the envelope drafts and the drafts would be deposited in Lloyd's account in the Jefferson National Bank ("JNB") in Florida.[1] Lloyd's received immediate credit for these drafts. JNB would then mail the drafts to SCN with a collection advice or ticket instructing SCN to pay or return the drafts within 72 hours. Lloyd's gave SCN written instructions to hold the drafts up to seven days.
 
 
 9
 When Campbell's first started buying cars from Lloyd's in 1986, Clanton's provided financial backing for Campbell's by advancing the funds to pick up drafts as soon as they arrived at SCN. Campbell's would repay Clanton's following the sale of an automobile. When Clanton's ceased the financial backing, Campbell's informed Drotch, who stated, "Don't worry, we will back you." Campbell's interpreted this statement as permitting time to sell the vehicle before picking up the drafts from SCN.
 
 
 10
 Veronica Barcus was the supervisor over the drafts at SCN. After the customer was informed that the drafts had arrived, they would be given to Ms. Barcus to hold until they were picked up or returned to the sending bank. When the customer paid for and picked up the draft, SCN would issue and mail its cashier's check to the sending bank.
 
 
 11
 Campbell's picked up and paid for all the drafts except the 24 involved in this lawsuit. When it picked up a draft, it would give Ms. Barcus a check drawn on the account of Clanton's. Clanton's was an SCN customer which maintained a substantial balance in its account and thus immediate credit was given to its checks. The check from Clanton's would be in an amount just over the amount of the draft, the difference being the profit Campbell's made on the transaction.
 
 
 12
 Simultaneously with the deposit of Clanton's checks to Campbell's account, Campbell's would issue a check payable to SCN to pay for the drafts. SCN debited this check against Campbell's account and issued a cashier's check payable to SCN which in turn was used to purchase SCN's own cashier's check payable to JNB.
 
 
 13
 If Campbell's could not sell a car at a price which would cover its expenses, it would keep the car and try to sell it the following week. Ms. Barcus explained that drafts were held more than seven days because Campbell's told her it had not sold the cars and that it would contact Drotch at Lloyd's to get permission to hold the drafts. She testified that she received calls from Lloyd's telling her to hold the drafts.
 
 
 14
 JNB put tracers on the drafts. When the tracers were received by SCN, SCN returned the remaining drafts to JNB. The first set of five or ten tracers arrived in April 1987 and the second set of 13 came in May 1987. Lloyd's continued to sell and ship cars to Campbell's throughout the summer of 1987.
 
 
 15
 Upon demand from JNB, each of these drafts was returned to it unopened with the title to the automobile inside. All of the automobiles represented by the drafts were retrieved by Lloyd's and sold either in Florida or Darlington. The 24 drafts which are the subject of this action total $184,750. Lloyd's received a total of $169,650 from the sale of the cars or $15,100 less than the face amount of the drafts.
 
 II
 
 16
 SCN challenges the award of actual damages asserting that Lloyd's elected its remedies when it demanded and accepted the return of the drafts and the accompanying titles. We agree.
 
 
 17
 Election of remedies has as its basic purpose the prevention of double recovery for a single wrong. Adams v. Grant, 292 S.C. 581, 358 S.E.2d 142, 144 (S.C.Ct.App.1986). "When an identical set of facts entitles the plaintiff to alternative remedies, he may plead and prove his entitlement to either or both; however, the plaintiff may not recover both." Save Charleston Foundation v. Murray, 333 S.E.2d 60, 64 (S.C.Ct.App.1985). "Application of the doctrine should be confined to cases where double compensation of the plaintiff is threatened." Id. (citing 25 Am.Jur.2d Election of Remedies Sec. 1, 646 (1966). Election of remedies "involves the choice between two or more different and coexisting modes of procedures or forms of relief afforded by law for the same injury ... [it is] the act of choosing between the different remedies allowed by law on the same set of facts." Harper v. Ethridge, 290 S.C. 112, 348 S.E.2d 374, 379 (S.C.Ct.App.1986) (quoting Boardman v. Lovett Enterprises, Inc., 283 S.C. 425, 428, 323 S.E.2d 784, 785 (S.C.App.1984), rev'd on other grounds, 287 S.C. 303, 338 S.E.2d 323 (S.C.1985). The doctrine is aimed at the different types of relief which might be available for the same injury. Boardman, supra, 323 S.E.2d at 785 (citing Tzouvelekas v. Tzouvelekas, 206 S.C. 90, 94, 33 S.E.2d 73, 74 (1945)).
 
 
 18
 Appellee had the option of demanding the drafts and titles or recovering from SCN the face value of the drafts. It elected the return of the drafts and titles, undoubtedly anticipating that the automobiles would be sold at a profit, or at least at the face value amount of the drafts. Unfortunately for Lloyd's, the proceeds of the sales of the automobiles totalled $15,100 less than the aggregate amount of the drafts. Nevertheless, appellee may not use hindsight to seek the difference.
 
 
 19
 Appellant also contests the award of consequential damages against a payor bank under S.C.Code Ann. Sec. 36-4-103(5) in an action based upon Sec. 36-4-302 or Sec. 36-4-419[2] and in the alternative argues that, if a payor bank may be held liable for consequential damages, there was insufficient evidence adduced at trial showing bad faith on the part of SCN. We decline to decide the principal issue as to whether or not a payor bank may be held liable for consequential damages under S.C.Code Ann. Sec. 36-4-103(5), since we conclude that the evidence was insufficient to show bad faith on behalf of SCN to award consequential damages to Lloyd's.
 
 
 20
 The trial judge instructed the jury as follows:
 
 
 21
 The trial judge instructed the jury as follows:
 
 
 22
 I instruct you from Sec. 36-2-103 in pertinent part as follows:
 
 
 23
 Sub-section (8), good faith. The phrase good faith, in the case of a merchant means honesty in fact and the observance of reasonable commercial standard of fair dealing in the trade. And under Sub-section [ (]19[) ] thereof, with further reference to the phrase good faith, it's stated, good faith means honesty in fact in the conduct or transaction concerned.
 
 
 24
 And in Sec. 36-4-103 of the S.C.Code of Laws, I instruct you from sub-paragraph (5) thereof, as follows:
 
 
 25
 The measure of damages for failure to exercise ordinary care in handling an item is the amount of the item reduced by an amount which could not have been realized by the use of ordinary care. And where there is bad faith, it includes other damages, if any, suffered by the party as a proximate consequence
 
 
 26
 Judge Perry instructed the jury that "good faith" was honesty in fact. Thus, in accordance with the instruction, there must be evidence of dishonesty in fact to find bad faith under Sec. 36-4-103(5). If interpreted this way, bad faith does not denote "manipulation" or "deception" as the appellee would have this Court construe that term.[3]
 
 
 27
 The standard of review is whether there was sufficient evidence upon which the jury could properly find a verdict for the plaintiff. Glaesner v. Beck/Arnely Corp., 790 F.2d 384, 389 (4th Cir.1986). We find the evidence was insufficient to conclude that SCN was acting dishonestly, in accordance with the instructions of the district court.
 
 
 28
 Ms. Barcus testified that she held the drafts because Lloyd's told her to do so. Although no employee at Lloyd's admitted to these conversations, it was apparently established at trial that no one from Lloyd's ever instructed her to return the drafts. The evidence showed that as soon as she received the tracers, she promptly returned the drafts to JNB, and SCN received no fee for any of its services relating to the drafts, nor was there any evidence indicating that any party benefited from holding the drafts. In addition, there was evidence that Campbell's maintained a minimal balance in its account.
 
 III
 
 29
 Lloyd's cross-appeals arguing that the trial judge abused his discretion when he denied plaintiff's three motions for sanctions.[4] The judge refused to compel SCN to release the daily balances of Campbell's account with SCN and also refused to compel SCN to respond to the admission,
 
 
 30
 [f]or each Draft, within seven days following the date of SCN's receipt of such Draft, there was at least one credit of funds to Campbell's Account in an amount exceeding the total amount of such draft and all other Drafts received the same day.
 
 
 31
 In the first instance, the records containing the bank statements for the months of January through May 1987 were delivered at the deposition of Leon Campbell on January 17, 1989. The daily balances could easily be calculated from these records.[5]
 
 
 32
 On the issue of SCN's failure to admit, its denial was based on the bank statements which showed balances insufficient to pay any draft and on the deposition testimony of Veronica Barcus concerning the handling of Campbell's account. Ms. Barcus testified that Campbell's would deposit a check into its account from Clanton's Auto Auction and simultaneously write a check for the same amount to SCN. SCN immediately credited its account based upon this deposit and then debited his account to pay the check. Campbell's check would be used to purchase an SCN cashier's check for forwarding to JNB. Campbell's account showed, in effect, insufficient funds to pay the drafts.
 
 
 33
 Under these circumstances, the district court did not abuse its discretion by denying Lloyd's motions for sanctions. See Stevens v. Lawyers Mutual Liability Ins. Co., 789 F.2d 1056, 1060 (4th Cir.1986) (the district court's decision to impose or not to impose sanctions is one which is not to be disturbed except for abuse of discretion).
 
 IV
 
 34
 Lloyd's also appeals the instruction that if the jury found that the plaintiff had mitigated its damages, the amount mitigated could be subtracted from the statutorily prescribed recovery for the face amount of the drafts. Cross-appellant first argues that such a charge erroneously implies an obligation on Lloyd's to prove causation of damages, and second that this instruction effectively precludes any deserved windfall.
 
 
 35
 Cross-appellant incorrectly characterizes the function of mitigation. Mitigation is not an element to be proved in a plaintiff's case-in-chief. It is a factor to be considered in the calculation of damages, once plaintiff has prevailed. See W.D. Bourne Supply Co. v. S.E. Freight Lines, 259 S.C. 139, 191 S.E.2d 4, 5 (1972) (mitigation affects the amount of recovery only).
 
 
 36
 Although many courts have held a payor bank strictly liable for the face amount of the check, others have allowed this amount to be set-off where the payee has mitigated damages. For example, in State and Savings Bank of Monticello, Indiana v. Meeker, 469 N.E.2d 55 (Ind.App.1984), and Met Frozen Food Corp. v. Nat'l Bank of North America, 393 N.Y.S.2d 643 (1977), a reduction of the face amount of the check under UCC Sec. 4-302 was permitted. In both cases, the payee had recourse against the drawer of the check and the courts allowed liability to be reduced by the amount obtained by the payee. Similarly, in Twellman v. Lindell Trust Co. v. Continental Bank & Trust Co., 534 S.W.2d 83 (Mo.App.1976), the court refused to narrowly construe UCC Sec. 3-419 so as to preclude a set-off in the amount "already covered by plaintiff." Id. at 96. In accordance with established law, we defer to the district court's interpretation of South Carolina law. Harris v. Pacific Floor Machinery Mfg. Co., 856 F.2d 64 (8th Cir.1988).[6]
 
 
 37
 AFFIRMED IN PART AND REVERSED IN PART.
 
 
 
 [1]
 SCN impleaded Jefferson National Bank at Sunny Isles but the Florida bank was later dismissed from the action
 
 
 [2]
 Section 36-3-419 provides in pertinent part:
 (1) An instrument is converted when
 (a) a drawee to whom it is delivered for acceptance refuses to return it on demand; or
 (b) any person to whom it is delivered for payment refuses on demand either to pay or return it; ...
 (2) In an action against a drawee under Subsection (1) the measure of the drawee's liability is the face amount of the instrument. In any other action under Subsection (1) the measure of liability is presumed to be the face amount of the instrument.
 Section 36-4-302 provides in pertinent part: In the absence of a valid defense such as breach of a presentment warranty (Subsection (1) of Sec. 36-4-207), a settlement effected or the like, if an item is presented on and received by a payor bank the bank is accountable for the amount of
 * * *
 (b) any other properly payable item unless within the time allowed for acceptance or payment of that item the bank either accepts or pays the item or returns it and accompanying documents.
 Section 36-4-103(5) provides:
 The measure of damages for failure to exercise ordinary care in handling an item is the amount of the item reduced by an amount which could not have been realized by the use of ordinary care, and where there is bad faith it includes other damages, if any, suffered by the party as a proximate consequence.
 
 
 [3]
 Appellee states that the evidence shows that SCN: (1) manipulated Campbell's account to Lloyd's detriment; (2) violated its own policy; (3) released drafts and title documents to Campbell's without exacting prior payment in hard funds; (4) when hard funds were received, did not remit them to Lloyd's, but allowed Campbell's to change its mind; and (5) purposefully delayed returning unpaid drafts to Lloyd's because SCN either had to get them back from Campbell's or give Campbell's time to try to sell the cars. Appellee's Br. at 21
 
 
 [4]
 Appellee, plaintiff below, moved for sanctions before trial, at the close of the evidence and post-trial
 
 
 [5]
 Although these copies were illegible, legible copies were received March 16, 1989
 
 
 [6]
 Alternatively, cross-appellant argues that South Carolina disfavors set-offs as seen by its adoption of the collateral source rule. Since no third party is involved, this argument is meritless